VIRGINIA ELECTRIC AND POWER CO., *a corp.*

*v.*

PUBLIC SERVICE COMMISSION OF W. VA.

(No. 14249)

Decided October 31, 1978.

*Guy T. Tripp, III, Hunton & Williams, Richmond, Va.,
Jackson, Kelly, Holt & O'Farrell, F. Paul Chambers and
Michael A. Albert* for petitioner.

*Joel B. Shifman* for respondent.

NEELY, JUSTICE:

This case presents two issues of law: first, whether the
Public Service Commission of West Virginia must give a
hearing to a public utility in this State before revising
that utility's tariff; and, second, whether the Public Ser-
vice Commission may revise a public utility's tariff ret-
roactively and require the utility to make refunds to its
customers based on the retroactive revision of the tariff.
We hold that a hearing is mandated before any tariff
revision may be made, and that revised tariffs cannot be
applied retroactively.

On 26 May 1978 the Public Service Commission of West
Virginia entered an order requiring appellant Virginia
Electric and Power Co. to file with the commission re-
vised tariffs effective 1 April 1978 and to make certain
refunds to its customers based retroactively on such re-
vised tariffs. This was a final order in a "Proceeding
Upon Commission's Own Motion" and was entered with-
out either notice or hearing. The commission indicated
in its order that the purpose of the lower tariff and the
resulting refunds was to "pass through" to the utility's
customers a reduction in the utility's cost of doing busi-
ness which resulted from a decrease in the State Busi-
ness and Occupation Tax on domestic sales of electricity

pursuant to the amendment of *W.Va. Code*, 11-13-2(d) effective 1 April 1978.[1] On 7 June 1978, the appellant utility petitioned for reconsideration and requested the commission to rescind its order and hold hearings as required by *W.Va. Code*, 24-2-3 [1923] or, in the alternative, to stay the effective date of the order for a reasonable time to permit the appellant to seek review in this Court pursuant to *W.Va. Code*, 24-5-1 [1923]. On 9 August 1978 the commission denied appellant utility's petition and the appellant brought this appeal.

Virginia Electric and Power Co. predicates its appeal upon the assertion that the commission's action constituted an unlawful taking of utility property without due process which would properly have included notice, a hearing, and detailed findings that the existing rates were unreasonable, all of which are codified in the mandate of *W.Va. Code*, 24-2-3 [1923]. The commission, on the other hand, predicates its defense on the authority granted to it by *W.Va. Code*, 24-2-2 [1935], which allegedly empowers it to change rates upon its own initiative and without the need for a hearing.

This Court must concede at the outset that the two statutes cited respectively by each of the parties in support of its own position are indeed inconsistent. The pertinent part of *W.Va. Code*, 24-2-2 [1935] says:

---

[1] The Public Service Commission's order in pertinent part provided:

1. The currently effective rates of the Virginia Electric and Power Company include an allowance for State Business and Occupation Taxes at pre-April 1, 1978 tax rates, which rates are no longer effective.

2. The currently effective rates of the Virginia Electric and Power Company are more than sufficient insofar as providing for a recovery of State Business and Occupation Taxes.

3. The rates and charges of the Virginia Electric and Power Company should be reduced to reflect actual State Business and Occupation Tax levels which became effective April 1, 1978.

4. The rates and charges ... are sufficient but not more than sufficient, to provide for recovery of State Business and Occupation Taxes based on tax rates effective April 1, 1978.

> The commission may change any intrastate rate, charge or toll which is unjust or unreasonable or any interstate charge with respect to matters of a purely local nature which have not been regulated by or pursuant to act of Congress and may prescribe such rate, charge or toll as would be just and reasonable, and change or prohibit any practice, device or method of service in order to prevent undue discrimination or favoritism between persons and between localities and between commodities for a like and contemporaneous service. . . .

It should be noted that this provision of the *Code* does not require a hearing as a condition precedent to the commission's modification of any intrastate rate; nonetheless, *W.Va. Code*, 24-2-3 [1923] essentially restates the authority granted by *W.Va. Code*, 24-2-2 [1935], but further requires a hearing before any action adverse to a utility can be taken. The pertinent part of *W.Va. Code*, 24-2-3 [1923] provides:

> And whenever the commission shall, *after hearing*, find any existing rates, tolls, tariffs, joint rates or schedules unjust, unreasonable, insufficient or unjustly discriminatory or otherwise in violation of any of the provisions of this chapter, the commission shall by an order fix reasonable rates, joint rates, tariffs, tolls or schedules to be followed in the future in lieu of those found to be unjust, unreasonable, insufficient or unjustly discriminatory or otherwise in violation of any provisions of law, and the said commission, in fixing the rate of any railroad company, may fix a fair, reasonable and just rate to be charged on any branch line thereof, independent of the rate charged on the main line of such railroad. [emphasis added]

The commission argues strenuously that the two statutes cited are independent of one another and, therefore, the commission has authority to alter a tariff on its own motion under *W.Va. Code*, 24-2-2 [1935], and that when the commission operates under *W.Va. Code*, 24-2-2

[1935] the hearing provision incorporated in *W.Va. Code*, 24-2-3 [1923] does not apply.

## I

The Court could dip its bucket down into the well called "Canons of Statutory Construction" to select a rule which would rationalize why we choose to require a hearing in this particular situation. The same well, however, would willingly provide a contrary rule which would rationalize a contrary result.[2] It would appear to

---

[2] The impossibility of intelligently using statutory construction rules as guidance in statutory construction can be illustrated by the following hypothetical address on that subject by an instructor at a judicial training conference:

It is undoubted that the court's burden is to interpret statutes as written, *Parsons v. Morland*, 140 W. Va. 20, 82 S.E.2d 183 (1954), with the legislature's intent being the paramount consideration, *State v. Robinson*, 134 W. Va. 524, 59 S.E.2d 884 (1950). What I will present to you is some rules to help you ascertain that intention. First of all, you must presume the legislature considered the constitution and did not intend to violate it, *Willis v. O'Brien*, 151 W. Va. 628, 153 S.E.2d 178 (1967), but, of course, if a legislative enactment is plainly in contravention of the constitution it must be declared invalid. *McKee v. Hedrick*, 146 W. Va. 777, 123 S.E.2d 227 (1961). You should not be concerned with the wisdom or motives of the legislature, *State ex rel. Metz v. Bailey*, 152 W. Va. 53, 159 S.E.2d 673 (1968), unless you are trying to ascertain the general scope and meaning of the statute by examining all its provisions, *State v. Aracoma—Chief Logan No. 4523, V.F.W.*, 147 W. Va. 645, 129 S.E.2d 921 (1963). You must follow the plain and simple language of a statute, *Crockett v. Andrews*, 153 W. Va. 714, 172 S.E.2d 384 (1970), unless there is a compelling reason to do otherwise. *Baird—Gatzmer Corp. v. Henry Clay Coal Mining Co.*, 131 W. Va. 793, 50 S.E.2d 673 (1948). The best measure of intent is the language used, *Spencer v. Yerace*, 155 W. Va. 54, 180 S.E.2d 868 (1971), unless a literal interpretation would end in absurdity, *Yerace, supra*. You can look to the title of the statute to ascertain intent, *City of Huntington v. State Water Comm.*, 135 W. Va. 568, 64 S.E.2d 225 (1951), but the title can not limit the plain meaning of the text, *Mazzella v. Yoke*, 70 F. Supp. 462 (S.D. W. Va. 1947). Don't confuse the title with chapter, article and section headings which cannot be used to ascertain intent, *W. Va. Code*, 2-2-12 [1965].

You will occasionally be faced with statutes *in pari materia*, ones that are part of the same general plan. These statutes

the Court that candor requires a reconciliation based only on what should be proper procedure under modern concepts of administrative law. The statutes are contradictory, but if we were to find that *W.Va. Code*, 24-2-2 [1935] permits a tariff to be revised without hearing,

should be read and construed together as if they formed parts of the same statute, *Owens—Illinois Glass Co. v. Battle*, 151 W. Va. 655, 154 S.E.2d 854 (1967), but unless necessary, statutes should not be construed so that two enactments cover the same subject matter wholly or in part, *Beatty v. Union Trust Deposit Co.*, 123 W. Va. 144, 13 S.E.2d 760 (1941); nor should statutes be read or construed together if the provisions are unambiguous, *State v. Jackson*, 145 W. Va. 51, 112 S.E.2d 452 (1960).

Statutes contain both general and specific language and the specific controls over the general, *State ex rel. Myers v. Wood*, 154 W. Va. 431, 175 S.E.2d 637 (1970), but the overall purpose of the statute will control its separate provisions, *State v. Perry*, 148 W. Va. 68, 132, S.E.2d 922 (1963), each of which must be given effect, *State ex rel. Ballard v. Vest*, 136 W. Va. 80, 65 S.E.2d 649 (1951).

One guide in statutory construction is to determine what evils the statute was intended to cure, *Bunts Engineering Co. v. Palmer*, 169 Va. 206, 192 S.E. 789 (1937), but legislative history cannot be used to create an otherwise nonexistent ambiguity, *Carter v. City of Norfolk*, 206 Va. 872, 147 S.E.2d 139 (1966). Nor should you forget that your interpretation should be made in light of the age in which we live, *Daniel v. Simms*, 49 W. Va. 554, 39 S.E. 690 (1901).

When you are faced with a statute whose enforcement is entrusted to public officials, their construction of the statute and practices are entitled to great weight, *Peyton v. Williams*, 206 Va. 595, 145 S.E.2d 147 (1965), but a practice in deviation from the statute cannot alter the statute, *Meeks v. State Compensation Comm'r.*, 143 W. Va. 732, 104 S.E.2d 685 (1958).

Occasionally two statutes will seem irreconcilable, but you must presume the legislature did not intend this, *Hoffer Bros. v. Smith*, 148 Va. 220, 138 S.E. 474 (1927). One statute should not be held to repeal another by implication, *West Virginia Div. of Izaak Walton League of America, Inc. v. Butz*, 522 F.2d 945 (4th Cir. 1975), unless, of course, they are irreconcilable, *Butz, supra*, which should be undoubted before you declare them so because, if possible, both statutes should stand, *State v. Sims*, 144 W. Va. 72, 105 S.E.2d 886 (1958).

Perhaps the best rule of statutory construction is that when one interpretation does justice and another interpretation does not, choose the one which does justice, *Rider v. Braxton County Court*, 74 W. Va. 712, 82 S.E. 1083 (1914).

then we would be further compelled to find that this statute violates well-established constitutionally mandated procedural due process requirements.

Laudable as the commission's goals may be in attempting to reduce the burden on utility consumers in this age of inflation, there is no question that a significant reduction in a utility's tariff is a taking of property which must be accompanied by some fair procedure to preclude an unlawful taking. The Business and Occupation Tax is but one element of a utility's cost and before the commission can pass through a reduction in that cost to consumers by changing the effective tariff, it must permit the utility to demonstrate that on its side overall costs have increased which would imply that a timely tariff reduction will effectively reduce the utility's rate of return below the constitutionally mandated fair rate of return.

When we look at the two statutes under consideration, we find that it was the intent of the legislature by enactment of *W.Va. Code*, 24-2-3 [1923] to provide a hearing before any adverse change in tariff could be effected and that *W.Va. Code*, 24-2-2 [1935] dealing with a more general subject, namely the general power of the commission to regulate public utilities, was inadvertently silent in this instance since the legislature would have been aware that the hearing requirement is implied by the *W. Va. Const.*, Art. III, § 10. In this regard it must be remembered that administrative law originated in the development of constitutional perimeters which circumscribe the administrative process.[3] The fact that these

---

[3] Contrary to the assumptions of most laymen and a number of those trained in the law, the protections embodied in the federal Administrative Procedure Act (APA) and its state cousins are not merely statutory creations which may be removed by the legislature. In fact, the fundamental protections of procedure and review were set forth as constitutional requirements long before the procedure statutes were enacted. The courts, confronted in the late nineteenth century with the exercise of great power by Interstate Commerce Commission officials who enjoyed neither elective nor judicial status, were forced to develop the constitutional limits of this power on a case-by-case basis until, by the late 1930s, judge-

original constitutional limitations were later codified by statute in such acts as the Administrative Procedure Act, 5 U.S.C. § 551 [1976] *et seq.*, the State Administrative Procedures Act, *W.Va. Code*, 29A-1-1 [1964] *et seq.*, or the Public Service Commission Act, *W.Va. Code*, 24-1-1 [1923] *et seq.* in no regard implies legislative authority to diminish or nullify the constitutional strictures. Conse-

---

made law had delineated the basic contours of the present APA. Congress acknowledged this fact in its report on the APA:

In fact, the present situation of indescribable confusion is due to the fact that the Congress has ignored the development of the administrative process prior to 1861; that since such time the Congress has created administrative agencies without regard to any uniformity of the judicial review provisions and without regard to the procedure developed and proven prior to that time; . . .

Furthermore the statutes, commencing with the Interstate Commerce Act, have made no provision whatever for improvement of the administrative process and rarely have these statutes attempted to prescribe, even in a general way, the scope of judicial review. The result has been that the administrative agencies and the courts have been required to work out the procedure from case to case . . . to lay down general rules of trial and appellate procedure. [1946] U.S. Code Cong. Serv. 79th Cong. 2d Sess. 1197.

The purpose of the APA and its state progeny was not so much to add new protection as it was to codify the old ones. It goes almost without saying, of course, that the legislature may impose more stringent procedural requirements, but it may not eliminate the established constitutional protections. The primary effect of the administrative procedure statutes has not been to change the law but to regularize and systematize the patchwork of judicial doctrine. It follows from this that the legislature is not free to change the substantive rights of administrative procedure. In keeping with the underlying principle (to use an example relevant to the case at hand), courts will imply a hearing requirement to a regulatory statute.

Federal and state constitutions alike provide that no person may be deprived of life, liberty or property without "due process of law." . . . If a statute is altogether silent about the procedure an administrator should utilize, both the administrators and the reviewing courts are nevertheless likely to assume an implied command to use procedural methods that comport with the due process requirements of the Fifth Amendment (as to federal matters) or the Fourteenth Amendment (as to state matters). W. Gellhorn & C. Byse, *Administrative Law* 575 (1974).

quently, statutory attempts to nullify constitutionally mandated procedural due process requirements either by contrary provisions or silence must be unavailing.

Furthermore, we find that the commission's action in failing to grant the Virginia Electric and Power Co. a hearing before modifying its tariff is in conflict with *W.Va. Code*, 24-5-1 [1923], which grants judicial review to any aggrieved party from any final order of the commission. That section provides in pertinent part:

> Any party feeling aggrieved by the entry of a final order by the commission, affecting him or it, may present a petition in writing to the supreme court of appeals, or to a judge thereof in vacation, within thirty days after the entry of such order, praying for the suspension of such final order. . . .

If there is no hearing in the Public Service Commission before the entry of an order such as the one under consideration, then necessarily there will be no record and, consequently, review of the commission's action will be impossible because this Court will be foreclosed from reviewing the methodology employed by the commission and the evidence supporting its decision.[4] If, indeed, the public utlility is always permitted to argue in this Court that the commission's action may reduce its rate of return below the constitutionally mandated fair rate of return, *Virginia Electric & Power Co. v. Public Service Com'n*, ____ W.Va. ____, 242 S.E.2d 698 (1978), then the utility must have an opportunity to submit evidence in that regard to the commission in order to make an appeal on that subject capable of resolution in this Court.

## II

The appellant utility also complains that it is aggrieved by the action of the Public Service Commission in making the tariff reduction retroactive to 1 April 1978

---

[4] For a more exhaustive discussion of the problem of methodology in a related administrative law field *see Citizens Bank of Weirton v. West Virginia Board of Banking and Financial Institutions*, ____ W. Va. ____, 233 S.E.2d 719 (1977).

on the grounds that *W.Va. Code*, 24-2-3 [1923] specifically provides that a change of tariff shall only be "followed in the future." We find that the utility's argument on this subject is well taken as *W.Va. Code*, 24-2-3 [1923] is specific when it says:

> [T]he commission shall by an order fix reasonable rates, joint rates, tariffs, tolls or schedules *to be followed in the future* in lieu of those found to be unjust, unreasonable, insufficient or unjustly discriminatory or otherwise in violation of any provisions of law, ... [emphasis added]

As the commission operates only by virtue of statutory mandate, and as its powers and duties are set forth specifically in the statutes governing its operation, the commission has no inherent power to operate in a manner contrary to its own statutory mandate. Therefore, we hold that the commission has erred as a matter of law by making the utility's rates retroactive.[5]

Accordingly for the reasons set forth above the order of the Public Service Commission from which the utility appeals is reversed and the case is remanded to the Public Service Commission for further proceedings consistent with this opinion.

*Reversed and remanded.*

---

[5] Obviously this does not in any regard affect the commission's authority to order refunds of excessive charges when rates are put into effect under bond pursuant to *W. Va. Code*, 24-2-4 [1974] which specifically authorizes such refunds and establishes a statutory procedure both for securing and refunding over-charges. It should be noted that contested rates placed into effect under *W. Va. Code*, 24-2-4 [1974] are not approved rates until after hearing and decision. *See Knight v. Public Service Commission*, ___ W.Va. ___, 245 S.E.2d 144 (1978).